IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

          Plaintiff,

     vs.                           Criminal Action

KHALIFA ALI AL-AKILI,            No. 12-196 M

          Defendant.

_____

     Transcript of PRELIMINARY HEARING AND DETENTION HEARING
held on March 16, 2012, in the United States District Court,
700 Grant Street, Pittsburgh, Pennsylvania, before
The Hon. Robert C. Mitchell, United States Magistrate

APPEARANCES:

| | |
|---|---|
| For the Government: | James Wilson |
| | Assistant United States Attorney |
| | |
| For the Defendant: | Michael J. Healey, Esq. |
| | 436 Seventh Avenue |
| | Koppers Building, Ste. 2901 |
| | Pittsburgh, PA 15219 |
| | |
| Court Reporter: | Deborah Rowe, RMR, CRR |
| | 5300 U.S. Courthouse |
| | 700 Grant Street |
| | Pittsburgh, PA  15219 |
| | (412) 208-7572 |

1                      P R O C E E D I N G S

2          (In open court, 1:55 p.m.:)

3          THE COURT:  This is the preliminary hearing and

4     detention hearing in the case of the United States versus

5     Khalifa Ali Al-Akili at Docket No. 12-196 M.

6                Sir, are you the Defendant, Khalifa Ali Al-Akili?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Are you represented by Mr. Healey?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  Mr. Wilson, do you want to proceed,

11    please?

12         MR. WILSON:  Thank you very much, Your Honor.

13    Your Honor, Mr. Healey and I spoke earlier today.  And I'll

14    outline for the Court very briefly what we would propose in

15    order to expedite this matter.

16              We would ask if we could introduce the affidavit

17    in support of the Criminal Complaint, make it part of this

18    record to serve as the factual basis for probable cause and

19    certain portions of the detention proceeding.

20              And if it's all right with the Court, Special

21    Agent Bieshelt, who will testify here today, he will testify

22    -- we will put in all the evidence concerning both probable

23    cause and detention at the same time and then turn him over

24    for cross-examination.

25              THE COURT:  That's just fine.  Do you want to

1   proceed?

2          MR. WILSON:  Thank you.

3          MR. HEALEY:  There's no objection to that, given

4   the limited application of the rules of evidence here.

5          MR. WILSON:  Would you like Mr. Bieshelt to take

6   the stand up here, Your Honor?

7          THE COURT:  Please.

8          THE CLERK:  Please state and spell your name for

9   the record.

10          THE WITNESS:  Joseph M. Bieshelt, B-i-e-s-h-e-l-t.

11          (The witness, Special Agent Joseph M. Bieshelt,

12   was duly sworn, and testified as follows:)

13                    DIRECT EXAMINATION

14   BY MR. WILSON:

15   Q.   Special Agent Bieshelt, you are employed by the FBI;

16   is that correct?

17   A.   That's correct.

18   Q.   How long have you been a special agent with the FBI?

19   A.   Approximately ten years.

20   Q.   And you're currently assigned to the Pittsburgh

21   division?

22   A.   Yes, I am.

23   Q.   Special Agent Bieshelt, relative to the Defendant in

24   this case, Mr. Khalifa Al-Akili, have you been active in any

25   respect in the investigation of the matter that brings us

1    here today?

2    A.    No.

3    Q.    This is not your case?

4    A.    Correct.

5    Q.    You are not the case agent?

6    A.    Correct.

7    Q.    What you're going to testify here concerning today

8    comes from your review of certain documents, records,

9    conversations with other agents, things of that sort; is

10   that correct?

11   A.    Yes, it is.

12   Q.    Now, Special Agent Bieshelt, I would ask you, sir,

13   did you become aware that the FBI came into possession of an

14   E-mail directed from an individual named Feek Brooks to the

15   Defendant in this particular matter?

16   A.    Yes, I have.

17   Q.    I direct your attention to the subject matter line of

18   that E-mail.  Could you tell us what the E-mail said?

19   A.    Yes.  The subject line of that E-mail was Khalifa,

20   the Sheik, at the range with the .22 long rifle.

21   Q.    Khalifa, the Sheik, and how did it say "the range"?

22   A.    It said "da range," d-a range, and then "with" would

23   be w-i-t, "wit".

24   Q.    The .22 long rifle?

25   A.    "Da .22," yeah.

1   Q.   And I'm not seeking in any way to cast aspersions on

2   choice of language, but it's sort of a slang title; is that

3   correct?

4   A.   Yes.  It appears to be.

5   Q.   And based on the date and time information contained

6   in the header of the E-mail, when was this particular E-mail

7   sent?

8   A.   The header indicated that it was sent on July 4,

9   2010, and at approximately 7:28 p.m.

10  Q.   Now, I direct your attention, Mr. Bieshelt, to the

11  fourth paragraph of the Complaint in support of the

12  affidavit of probable cause and ask you, sir, if in that

13  paragraph is there a particular photograph that was attached

14  to the E-mail referenced?

15  A.   Yes.  There was a photograph attached to that E-mail.

16  Q.   And did a member of the FBI or someone who works at

17  the FBI look at this particular photograph in an attempt to

18  make an identification of the person depicted therein?

19  A.   Yes.  The case agent, Jay Neely, made that

20  identification.

21  Q.   Okay.  Now, who did he identify the photograph as?

22  A.   He said the photograph was identified as the

23  Defendant.

24  Q.   Okay.  Mr. Al-Akili?

25  A.   Yes.

1    Q.   Had Mr. Neely -- based on your exchange with him, had

2    Mr. Neely had an opportunity to actually see the Defendant

3    on previous occasions?

4    A.   Yes.  He has seen the Defendant on previous

5    occasions.

6    Q.   Did he indicate for you or in the affidavit

7    approximately how many times?

8    A.   Approximately fifteen times.

9         MR. WILSON:  Your Honor, with the Court's

10   permission, I would like to display for the Court and for

11   counsel the photograph about which we're talking.

12        THE COURT:  Okay.

13        MR. WILSON:  We're going to put it up on the --

14        THE COURT:  It should work on the individual

15   monitors too, if you want.

16        MR. WILSON:  I hope it will come up, sir.

17        MR. HEALEY:  Your Honor, do we need to do anything

18   with the monitors?

19        THE COURT:  Is it turned on?  It should be a blue

20   screen.

21        MR. HEALEY:  No, it's not.  Okay.  Here we go.

22        MR. WILSON:  Mr. Healey, do you have it on your

23   monitor back there?

24        MR. HEALEY:  Yes.  We do.

25

1  BY MR. WILSON:

2      Q.   Now, Mr. Bieshelt, if you would, please, the

3  photograph referenced in Paragraph 4, which is described in

4  the affidavit in support of the Complaint as an image of a

5  person holding a gun, was identified with the numbers 890;

6  is that correct?

7      A.   That is correct.

8      Q.   Is this the photograph about which we're talking?

9      A.   Yes.  It is.

10      Q.   And it appears to depict an individual for the record

11  in the left-hand portion of the photograph aiming a long

12  rifle downrange toward a target?  Is that a fair statement?

13      A.   Yes.

14      Q.   And who did Mr. Neely identify this person as?

15      A.   Mr. Neely identified this person as the Defendant.

16      Q.   Now, was there also attached to the E-mail about

17  which you've offered testimony a different depiction

18  designated with the numbers 888 that was actually a video

19  recording?

20      A.   Yes, there was.

21      Q.   And can you describe generally for us what was

22  depicted in the video recording?

23      A.   The video recording of 888 was approximately a

24  seven-second clip, and it shows who was identified as the

25  Defendant holding the rifle at the firing range.

1    Q.    I'll play that once again with the Court's

2    permission.

3              Now, at the conclusion of the video where the

4    frame stops, Special Agent Bieshelt, in the lower right

5    third of the photograph there are some other items resting

6    there on the gun table at the firing range.  Could you

7    indicate, please, what you see there depicted?

8    A.    It appears to be a revolver type pistol, and also an

9    open -- open boxes of ammunition.

10   Q.    Now, there appears also to be a pair of glasses at

11   the back part of the bench.  Can you indicate what those

12   might be for?

13   A.    Those would be safety glasses.  They're used when

14   you're shooting a firearm.

15   Q.    Now, Special Agent Bieshelt, with regard to this

16   video and the photograph which we've already identified,

17   0890, and another photograph which we'll look at in just a

18   moment, were these attachments to the video -- or excuse

19   me -- to the E-mail provided to any specialists within the

20   FBI for their review?

21   A.    Yes.  The case agent provided these files to our

22   computer analysis response team, the CART team.

23   Q.    And was one of the objectives of their analysis to

24   determine whether or not, based on the digital reproduction

25   of the video and the photographs, there was digital

1    information in there that identifies the date on which the

2    photographs were taken?

3        A.    Yes.   That's what they were looking for.

4        Q.    And what were they able to conclude?

5        A.    They were able to conclude that the images were

6    produced on July 4 of 2010.

7        Q.    Now, in the affidavit supporting the Complaint, the

8    affidavit of probable cause, there is another image

9    identified in Paragraph 8 of that affidavit identified as

10   0894.  I ask you if you will look at that for a moment,

11   please.  Can you just describe generally for the record

12   what's depicted in that particular photograph?

13       A.    Again, it appears to be at the same firing range, and

14   it appears to have the Defendant in the left-hand portion of

15   that picture at the firing station.

16       Q.    And you've already testified, Special Agent Bieshelt,

17   that based on the header of the E-mail information, the

18   E-mail which contained these particular depictions, both

19   photographs and video, was sent on the Fourth of July of

20   2010?

21       A.    Correct.

22       Q.    What time does the header say the photograph was

23   sent?

24       A.    It says the photograph was sent in the E-mail at

25   approximately 7:28 p.m.

1    Q.    Now, subsequent to the review of the E-mail which the

2    FBI came into possession of and the review of the

3    attachments to the E-mail depicting the firing range and the

4    Defendant and so forth, was there an attempt made to

5    interview the person identified as Feek Brooks?

6    A.    Yes.  Yes.  There was.

7    Q.    Now, let me back up for just a second.  Did the FBI

8    also have in its possession E-mail information that gave the

9    FBI some sense of who Feek Brooks was?

10   A.    Yes.  The FBI reviewed documentation that identified

11   Feek Brooks as Rafiq Brookins.

12   Q.    Now, based on your interaction with agents who are

13   actively involved with this investigation, did they have

14   knowledge of an individual named Rafiq Brookins in

15   connection with the Defendant?

16   A.    Yes.  Their knowledge was that Rafiq Brookins was a

17   friend of the Defendant's.

18   Q.    Did they go to interview Mr. Brookins?

19   A.    Yes.  They did.

20   Q.    Could you tell the Court when that first interview of

21   Mr. Brookins took place?

22   A.    March 12 of 2012.

23   Q.    So just a very few days ago?

24   A.    Yes.

25   Q.    Did Mr. Brookins at that time indicate that he had

1    any knowledge about the creation of the photographs that

2    we've shown the Court this afternoon?

3        A.    Yes.  Yes.  He did.

4        Q.    And did he indicate when he went to the shooting

5    range and when those photographs were produced?

6        A.    Yes.  He indicated that he went to the range in June

7    or July of 2010 generally.

8        Q.    Okay.  And did he indicate for the Bureau who went

9    with him to the shooting range that particular day?

10       A.    Yeah.  He identified that there were four people on

11   that trip to the shooting range.  It was Brookins himself,

12   the Defendant, a Pakistani with red skin and another

13   individual.

14       Q.    There was no further identification of this Pakistani

15   person other than the description of his complexion?

16       A.    Correct.

17       Q.    But he did indicate that he went along with the

18   Defendant in this case, Mr. Al-Akili?

19       A.    Yes.  He did.

20       Q.    Did Mr. Brookins identify the rifle that we've seen

21   depicted in the pictures and the video?

22       A.    Yes.  He identified the rifle.

23       Q.    And did he say what kind of rifle generically it was?

24       A.    He identified the rifle as a .22 caliber butt fed

25   rifle.

1    Q.   Now, did he indicate to whom the rifle belonged?

2    A.   Yes.  He said it belonged to him.

3    Q.   And did he indicate at all to the FBI what has

4  happened to that rifle or where it is presently?

5    A.   Yes.  He indicated that eventually his father took

6  that gun into his possession, and it was later destroyed in

7  a fire.

8    Q.   Did Mr. Brookins -- was Mr. Brookins given the

9  opportunity to view the photographs that we've shown for the

10  Court today to see if he could identify who was holding the

11  rifle in those pictures?

12    A.   Yes.  He was shown those photographs.

13    Q.   And what did he say about -- about particularly the

14  picture pointing the rifle downrange toward the target?

15    A.   He identified the individuals in those photographs as

16  the Defendant.

17    Q.   Now, was Mr. Brookins interviewed again after the

18  12th of March of this year?

19    A.   Yes.  Immediately the next day on the 13th.

20    Q.   So on the 13th?

21    A.   Yes.

22    Q.   Now, at the time of the subsequent interview, just in

23  general terms, was his information to the FBI consistent

24  with what he'd said the day before or inconsistent?

25    A.   Slightly inconsistent.

1    Q.   And did he indicate whether in the interim between

2    the two interviews he had had the opportunity to meet and

3    talk with the Defendant or talk with him without meeting

4    him, the Defendant in this case, Mr. Al-Akili?

5    A.   Yes.  He admitted to communicating with the Defendant

6    in between the two interviews.

7    Q.   And did he acknowledge to the FBI that he had

8    discussed the substance of what he told the agents the day

9    before?

10   A.   Yes.  He did.

11   Q.   Now, on the occasion of the 13th when Mr. Brookins

12   was again interviewed, can you indicate for the Judge,

13   please, in what manner, if at all, he retracted or backed

14   away from something he had said the day before?

15   A.   What Rafiq said was he was again unsure that the

16   Defendant actually fired the weapon.  That was the

17   inconsistency.

18   Q.   Okay.  But did he affirm that it was, in fact,

19   Mr. Al-Akili present at the firing range with the rifle in

20   his hand, with the open boxes of ammunition sitting on the

21   table beside him?

22   A.   Yes.  He did confirm that.

23   Q.   Now, has the FBI received any information from the

24   Bureau of Alcohol, Tobacco, Firearms & Explosives in terms

25   of attempting to identify this particular weapon and/or say

1   where it was or was not manufactured?

2       A.    Yes.

3       Q.    And what information did they receive?

4       A.    They confirmed that it was a butt fed .22 caliber

5   rifle, and they also indicated that there was only two

6   manufacturers of .22 caliber rifles in Pennsylvania, and

7   both of them only manufactured bolt action rifles.

8       Q.    Okay.  Do you know that those two manufacturers are

9   Keystone and Tenex, or is that not something you're aware

10  of?

11      A.    I'm not aware of that.

12      Q.    But those manufacturers only make bolt action rifles?

13      A.    Apparently, yes.

14      Q.    And this was not a bolt action rifle?

15      A.    Correct.

16      Q.    Now, have you corresponded or -- corresponded would

17  not be a good word.  Have you communicated with an agent or

18  agents that were present for the arrest of the Defendant and

19  the search of his home?

20      A.    Yes.  I have.

21      Q.    And those events took place yesterday; is that

22  correct?

23      A.    Correct.

24      Q.    Could you describe for the Court, please, what you

25  learned about the Defendant's response when the FBI pulled

1    up and identified themselves and attempted to effect the

2    arrest?

3       A.    I talked to a member of the FBI SWAT team who

4    effected the arrest.   He noted that they arrived in an

5    unmarked vehicle, exited the vehicle and approached the

6    Defendant, identifying themselves as FBI, advised the

7    Defendant he is under arrest, and at that time the Defendant

8    turned and ran toward the entrance of his residence.

9       Q.    Now, when you indicate that they told you they

10   identified themselves as FBI agents, was this one

11   identification, or were they repeatedly identifying

12   themselves?

13      A.    They repeatedly identified themselves and yelled out

14   commands to the Defendant as he was continue -- continued to

15   his front door.

16      Q.    Commands like "Stop" or "FBI"?

17      A.    "Stop, you're under arrest, police."

18      Q.    Did he stop?

19      A.    No.   He did not.

20      Q.    Did he yield to them and, you know, whatever you do

21   when someone's going to arrest you, put your hands up, put

22   them behind his back, anything like that?

23      A.    No.   The agent I spoke to said he was noncompliant in

24   that matter.

25      Q.    Okay.   How far did he run or move from the place

1   where the Bureau agents first saw him to where they were

2   able to apprehend him?

3   A.   The agents stated it was approximately fifteen to

4   twenty yards.

5   Q.   And were they able to safely take him into custody at

6   that time?

7   A.   Yes.   Once he arrived at the door, they said it

8   appeared that he was trying to enter in a code into the door

9   to enter the residence.   But the agents had caught up with

10   him by then, and at that point he put his hands up.

11   Q.   Okay.   Now, when you say the residence, are we

12   talking about the apartment building where the Defendant

13   lived?

14   A.   Yes.

15   Q.   And you say the door -- he was at a door trying to

16   put in a code.   Was this the external door, or was this an

17   internal door in the lobby area?

18   A.   Apparently it was an internal door.   There was an

19   external door that was -- I mean an external door that was

20   already opened, and it was the internal door that apparently

21   had a locking mechanism that you needed to put a code in.

22   Q.   So in running from the agents, he got through the

23   external door but was not able to get through the code

24   locked door inside?

25   A.   Correct.

1    Q.   Now, have you as part of your preparation for your

2    testimony here today, Special Agent Bieshelt, have you been

3    in touch with other law enforcement agencies and/or reviewed

4    records of other law enforcement agencies relative to other

5    events of apprehension of the Defendant?

6    A.   Yes, I have.

7    Q.   I want to direct your attention specifically to an

8    August 1999 arrest by the Jeannette Police Department.  Can

9    you tell the Court what you've learned about that event,

10   please?

11   A.    Yes.  In August 1999 the Jeannette Police Department

12   was called to a complaint at a local bar to where the

13   Defendant apparently started a fight with a 47-year-old

14   female and allegedly punched her in the face.

15         When they arrived, the Defendant had already fled

16   the scene.  The police officers then eventually found out

17   where the Defendant was and approached him at that location.

18         And at that location the Defendant refused to open

19   the door at first; and eventually when he did open the door,

20   he began fighting with the police officers that were there

21   to effect an arrest.

22   Q.   Now, based on your review of the records of this

23   event and what others have told you about the event, when

24   you say they effected an arrest, did they eventually put the

25   cuffs on the Defendant, and then all the fighting and

1    resistance stopped, or did something else happen?

2      A.    No.   Absolutely not.   They mentioned the fighting

3    started or appeared to start immediately and continued even

4    after he was in handcuffs and continued -- once he was

5    brought to the police station and tried to -- taken out from

6    the police car, he continued to fight.

7      Q.    He continued to resist and fight at the police

8    station?

9      A.    Correct.

10     Q.    Now, was there another event involving the North

11   Versailles Police Department in 2006?

12     A.    Yes.   In 2006 there was a report to the North

13   Versailles Township Police Department that the Defendant was

14   involved in a retail theft from a K-Mart.   Apparently the

15   Defendant departed the K-Mart and fled on foot to an

16   abandoned Wendy's, where he hid in a freezer area or a

17   cooling unit area of the abandoned Wendy's, and that's where

18   the North Versailles Police Department made contact with

19   him.

20     Q.    At the time they made contact with him, did you

21   actually speak with one of the officers involved in this

22   event?

23     A.    Yes.   I did.   I spoke to Officer Nee today.

24     Q.    And how did he describe for you what transpired once

25   he arrived, identified himself as a police officer to the

1    Defendant?

2        A.    Once he identified himself as a police officer to the

3    Defendant, what he explained was that the Defendant

4    pretended like the police officer wasn't there, did not

5    listen to him and did not comply to his commands.

6        Q.    And did some struggle ensue in an attempt to get

7    handcuffs on the Defendant and get him under control?

8        A.    Yes.  They were commanding the Defendant to put his

9    hands up or put his hands behind his back.  The Defendant

10   did not comply, to where the agents took -- had to take

11   force, and it took approximately three to four minutes to

12   place handcuffs on the Defendant with two individuals.

13       Q.    Now, Special Agent Bieshelt, in talking to Officer

14   Nee today, would you describe physically how big Officer Nee

15   is?

16       A.    He's approximately your size.

17       Q.    Okay.  So he's balding and overweight?

18       A.    I didn't say that.

19       Q.    So he's about my height?

20       A.    Yes.

21       Q.    Did he indicate if someone was with him?

22       A.    Yes.  He said his -- now it's his chief, but I

23   believe it was his sergeant at that time, but he did state

24   that the individual that was with him was a very big

25   individual, almost seven feet tall.

1    Q.   And that with Mr. Nee and this other sergeant,

2    Officer Nee and this other sergeant, it still took almost

3    four minutes to subdue the Defendant and get him in custody;

4    is that correct?

5    A.   Correct.

6    Q.   Now, I want to go back for just a moment, Special

7    Agent Bieshelt, to the events of yesterday at the time when

8    the FBI effected the arrest and then did a search of the

9    Defendant's apartment.  Did you receive information as to

10   some observations that the agents made of things in the

11   apartment that they did not seize because they believed them

12   to be beyond the scope of their warrant but they nonetheless

13   observed in and around the apartment?

14   A.   Yes.  In the course of their search, I was advised

15   that they observed what they characterized as Jihadist

16   literature and also books on U.S. military tactics.

17          MR. WILSON:  May I have just a moment, Your Honor?

18          THE COURT:  Sure.

19          (Brief pause.)

20   Q.   To put this assertion about Jihadist literature and

21   books on military tactics in context, I want to ask you as

22   the last part of our inquiry here, Special Agent Bieshelt,

23   did you have the opportunity to review some information very

24   briefly about source contact with the FBI concerning the

25   Defendant in this case?

1    A.    Yes.  I did.

2    Q.    Could you just briefly describe for the Court what

3    you mean when you say source?

4    A.    To a source, what I'm referring to is an individual

5    that has provided the FBI with information, and there are

6    different types of sources.  Some can be very reliable, and

7    we can refer to those as established sources, or

8    unidentified sources where we really have not verified their

9    information.

10   Q.    Did you personally take the information from any of

11   the sources you're going to be describing for the Court

12   today?

13   A.    No.  I have not.

14   Q.    Did you personally engage with any of them in any

15   way?

16   A.    No, I did not.

17   Q.    Now, I want to direct your attention to February of

18   2005 and ask you, sir, if the FBI had contact with a source

19   at that time who had been in prison with the Defendant and

20   advised about a certain piece of literature that he had been

21   given by the Defendant?

22   A.    Yes.  I did.  And that source had advised the FBI

23   that the Defendant has stated that he has big plans to go

24   overseas and join some resistance fronts but has not been

25   specific to that source.

22

1    Q.    Okay.  Did he receive any literature from the

2    Defendant, this particular source?

3    A.    Yes.  Actually that source has advised that the

4    Defendant provided that source with a publication, and the

5    main topics in the publication were supporting the

6    Mujahideen and the insurgency in Iraq and Afghanistan, and

7    the articles were very anti-American and promoted

8    retaliation and violence to Americans and the U.S. military,

9    and they also spoke of how to defeat U.S. military through

10   guerilla type tactics.

11   Q.    So there was a specific time reference in this piece

12   of literature to military tactics vis-a-vis the U.S. Army?

13   A.    Correct.

14   Q.    Did you also encounter information about an

15   unidentified source who wrote a letter to the FBI in

16   December of 2005?

17   A.    Yes.  And that source merely -- the source advised

18   that the Defendant is extremely radical, and he has talked

19   about joining Jihad and the struggle.

20   Q.    And I direct your attention to an event on April 22

21   of 2005.  Did you receive or review information concerning

22   an unidentified source from that particular time?

23   A.    Yes, I did.

24   Q.    Did the Defendant indicate something to the source

25   about John Walker Lindh?

1    A.    Yes.  The Defendant advised the source that the

2    reason that he filed a petition while in prison was to try

3    and duplicate what John Walker Lindh did.

4    Q.    And are you familiar with who John Walker Lindh was?

5    A.    Basically, yes.

6    Q.    Generically referred to as the American Taliban?

7    A.    The American Taliban, yes.

8    Q.    Did the source also provide information about the

9    Defendant's own sort of self-identification or

10   self-reference?

11   A.    Yes.  The source advised that the Defendant

12   identifies himself as an American, but hates law enforcement

13   and the government; and, furthermore, the U.S. government is

14   going to hell for their support of Israel.

15   Q.    I want to direct your attention to another part of

16   the information you may have reviewed regarding this

17   particular source and ask you, Special Agent Bieshelt, did

18   he indicate that the Defendant had made any statements about

19   following the Taliban and whether or not this was something

20   he aspired to do?

21   A.    Yes.  Absolutely.  The source advised that the

22   Defendant told him while in prison that he would send

23   Islamic questions to a teacher in South Africa, and the

24   Defendant claims his teacher's teaching of Islam is similar

25   to that of the Taliban and that the Defendant claims that

1   following the Taliban is the correct path form; and the

2   source asked the Defendant if he wished to become a Taliban

3   member, and the Defendant informed the source, "Inshallah,

4   one day I will be."

5          Then the Defendant claimed he will one day bear

6   arms on behalf of the Taliban against the United States,

7   Christians and Jews, and then the Defendant exclaimed

8   "Shaheed," and the asset -- or the source informed that

9   shaheed means to die like a martyr.

10   Q.   So I want to direct your attention to now a source

11   information provided in December of 2009 and ask you if at

12   that time a source provided information to the FBI about the

13   Defendant's perspective on his own citizenship?

14   A.   Yes.  This source had stated that the Defendant told

15   him that he was interested in denouncing his U.S.

16   citizenship and applying for citizenship in Pakistan, and

17   his ultimate desire is to move to the Afghan-Pakistan region

18   and live in rural mountain areas with Mujahideen fighters

19   and to assist in a variety of ways in their struggle against

20   U.S. military and western invaders.

21   Q.   One last item, Special Agent Bieshelt, in this

22   regard, I direct your attention to a source communication

23   from December of this past year, 2011.  Do you have

24   information from a source who engaged in consensual

25   recordings with the Defendant in and around that time?

1    A.    Yes.

2    Q.    Directing your attention to December 16, did the

3  Defendant have any discussion with this source about the

4  Taliban and whether or not he supported them?

5    A.    Yes.  Yes.  The source and the Defendant discussed

6  the Taliban, and the Defendant supported both the Taliban

7  and Pakistan and Afghanistan.

8    Q.    And did the Defendant and this person who was making

9  the recording engage in a discussion about whether or not

10  the Defendant had anyone else that he was trying to

11  influence or -- train may not be the right word -- but

12  influence relative to Jihadist type action?

13    A.    Yes.  From the tape it appears the Defendant had

14  mentioned that he was developing somebody to possibly strap

15  a bomb on themselves.

16            MR. WILSON:  May I have just a moment, Your Honor?

17            THE COURT:  Sure.

18            (Brief pause.)

19            MR. WILSON:  Your Honor, other than some argument

20  and noting the contents of the pretrial services report, I

21  have no other testimony to elicit from this witness at this

22  time.

23            THE COURT:  Thank you.  Mr. Healey?

24                        CROSS-EXAMINATION

25

1  BY MR. HEALEY:

2      Q.   Sir, we've met briefly.  My name's Mike Healey.  I

3  represent the Defendant in the case.  I want to touch at the

4  end of your testimony and then go back to some things you

5  talked about early on.  You talked about a source who I

6  think you said was in prison with the Defendant in 2005?

7      A.   Yes.

8      Q.   And you had indicated that the source indicated that

9  the Defendant wanted to hook up with the Taliban or the

10  Mujahideen; is that correct?

11      A.   Yes.

12      Q.   And since 2005 the Defendant has not traveled to

13  Pakistan or Afghanistan; has he?

14      A.   Not that I'm aware of.  I don't know.

15      Q.   He hasn't even traveled to the Middle East; has he?

16      A.   I don't know.

17      Q.   Prior to this court hearing, have you ever seen the

18  Defendant before yourself?

19      A.   No.  I have not.

20      Q.   And you're not really involved in the investigation

21  directly; is that correct?

22      A.   Correct.

23      Q.   I want to go back to Mr. Wilson showed a video and a

24  couple photos, and I assume you remember those photos?

25      A.   Yes.

27

1    Q.   And also there had been interviews of a Rafiq

2    Brookins; is that correct?

3    A.   Yes.

4    Q.   Now, the rifle that was depicted in the photo, that

5    belonged to Mr. Brookins; is that correct?

6    A.   According to Mr. Brookins, yes.

7    Q.   There was a pistol in one of the tables that was I

8    guess near where people were.  That belonged to Mr. Brookins

9    also; didn't it?

10   A.   Yes.  I believe in his interview he said that, yes.

11   Q.   Do you know the name -- did Mr. Brookins tell you the

12   names of the other individuals that were present that day?

13   A.   No.  I'm sorry.  In the -- yes.  In his interview he

14   did name one other individual.

15   Q.   And what was the name of that individual?

16   A.   I'm trying to find it here.  Manseur (phonetic).

17   Q.   Now, this occurred in about -- the visit to the gun

18   range was in about June or July of 2010; is that correct?

19   A.   Yes.

20   Q.   And where is this gun range located?

21   A.   I do not know.

22   Q.   So we don't know if it's in Pennsylvania, in Canada

23   or in Massachusetts; do we?

24   A.   Mr. Brookins stated it was approximately 45 minutes

25   away from his place of work here in Pittsburgh.

1    Q.    But did he say -- did he tell you the name of the

2    shooting range?

3    A.    No.

4    Q.    Did he give you directions to the shooting range?

5    A.    No.

6    Q.    Did anyone from the FBI try to go to the shooting

7    range?

8    A.    I'm not aware if they did or not.

9    Q.    The rifle that's mentioned in this particular case,

10   do you know where that rifle is manufactured?

11   A.    No, I don't.

12   Q.    Now, there were -- you indicated that -- when he was

13   arrested yesterday, there were a number of items taken from

14   his house; is that correct?

15   A.    I have not reviewed the items from the search.  So

16   I'm unsure of that.

17   Q.    So you don't know exactly -- can we assume the

18   computers and photographs were taken from the house?

19   A.    I don't know.

20   Q.    Have you reviewed the affidavit of probable cause for

21   the search warrant?

22   A.    Not for the search warrant, no.

23   Q.    Have you reviewed an inventory concerning what was

24   taken from the house?

25   A.    No.  I have not.

1    Q.    You weren't present for the search; is that correct?

2    A.    Correct.

3    Q.    Now, you indicated to him that while they weren't

4  seized, some agent -- an agent or agents indicated there was

5  Jihadist literature; is that correct?

6    A.    Correct.

7    Q.    Did he indicate to you an author or a title of any of

8  the literature?

9    A.    No.  They did not.

10   Q.    Would it be a fair statement that they told you there

11 were hundreds of books in the house?

12   A.    I did not get a volume of how many books were there.

13   Q.    Did they mention to you that there were also Bibles

14 in the house?

15   A.    No.  They didn't.

16   Q.    Now, you've indicated the sources advised of

17 different things concerning what my client wanted to do at

18 different times; is that correct, concerning the Taliban and

19 things like that?

20   A.    Yes.

21   Q.    Okay.  One of the things he mentioned was he wanted

22 to hook up with the Mujahideen in Afghanistan; is that

23 correct?

24   A.    Correct.

25   Q.    And you're aware of course, aren't you, that in the

1    1980s the U.S. government funded the Mujahideen in

2    Afghanistan against the Soviets?

3        A.   No, I'm not.

4        Q.   Are you aware that the U.S. government on this day

5    funds the Mujahideen in Iran in regard to their activities

6    in Iran?

7        A.   I'm not aware of that.

8        Q.   No, in regard to a source I believe you said in 2009,

9    who indicated my client wanted to renounce his citizenship

10   -- is that correct?

11       A.   Yes.

12       Q.   Now, are you aware that my client's married to a

13   woman that's a U.K. national?  Is a national --

14       A.   No.  I'm not aware of that.

15       Q.   Are you aware that they're taking steps to get her

16   citizenship in this country?

17       A.   No.  I'm not aware of that.

18       Q.   Are you aware of an interview that FBI agents

19   conducted with my client a few years ago in which he was

20   asked, paraphrasing, do you hate -- would you do any harm to

21   this country?

22       A.   I've not reviewed that interview, no.

23       Q.   Are you aware there have been interviews at different

24   times?

25       A.   No.  I'm not even aware of that.

1   Q.   So you don't know if in response to that question my

2   client said, "No.  Citizenship is a contract.  I wouldn't

3   hurt this country"?

4   A.   No.  I'm not aware of that.

5   Q.   Now, you referred to source contacts.  Am I using the

6   correct language?

7   A.   Yes.

8   Q.   And do sometimes people refer to them as informants

9   or cooperating witnesses, depending on the context?

10  A.   Correct, yes.

11  Q.   Now, it would be a fair statement, would it not, that

12  at least two of these source contacts went to my client and

13  tried to get him to sell them guns?

14  A.   I'm not aware of that.

15  Q.   So if agents in this investigation tried to have that

16  done, you wouldn't know about that?

17  A.   Correct.

18  Q.   Now, in regard to Rafiq Brookins, he's the -- he's a

19  friend of my client's; is that correct?

20  A.   That's what I understand, yes.

21  Q.   And you interviewed him on at least two occasions; is

22  that correct?

23  A.   Excuse me?  Can you repeat that?

24  Q.   Yeah.  And I apologize.  I'm congested, so I may be

25  slurring my -- and medicated, so I may be spacier than

1   normal.  But agents have talked with Mr. Brookins on at

2   least two occasions this week; is that correct?

3       A.   That's correct.

4       Q.   And on the last occasion Mr. Brookins indicated he's

5   not sure if my client fired a weapon the day they were at

6   the shooting range?

7       A.   Yes.

8       Q.   And in regard to this particular case, either from

9   Mr. Brookins or the house or any place else, there's no guns

10  that the government has seized from my client or his house;

11  is that correct?

12      A.   I'm not aware of any.

13      Q.   And there's no ammunition that has been seized from

14  my client or his house; is that correct?

15      A.   Not that I have knowledge of.

16      Q.   And in regard to the search yesterday, there's been

17  no report that -- there's no weapons of any kind taken from

18  his house; is that correct?

19      A.   Not that I'm aware of.

20      Q.   Now, you talked about a couple situations involving

21  arrests and I believe convictions of my client.  One was in

22  1999.  Do you recall that testimony?

23      A.   Yes.

24      Q.   And you referred to the Jeannette police; is that

25  correct?

1    A.    Yes.

2    Q.    And your testimony is based on what the Jeannette

3    police have told you; is that correct?

4    A.    It's based off of a police report that we received

5    from Jeannette.

6    Q.    And you're aware that my client was convicted of

7    resisting arrest from that incident; is that correct?

8    A.    I was not aware of what the outcome of that arrest

9    was.

10   Q.    So as we sit here, you have no idea what he was

11   convicted of?

12   A.    I haven't reviewed his criminal record.

13   Q.    In 2006 -- in your testimony you referred to an

14   incident in 2006 with the North Versailles police.  Do you

15   remember that?

16   A.    Yes.

17   Q.    Do you know what my client was charged with in that

18   incident?

19   A.    I could look at the report here.

20   Q.    If you could, that would be fine.  And while you're

21   looking, the question is do you recall he was charged with

22   retail theft and resisting arrest?

23   A.    The offense is listed here criminal trespass,

24   resisting arrest and retail theft.

25   Q.    And do you have in front of you what he was charged

1    with in the Jeannette arrest?  August 1999 if it helps, sir.

2    A.    Yes.  Simple assault and resisting arrest.

3    Q.    Now, you referred to in regard -- referring to one of

4    your sources that in December of 2011 there were consensual

5    recordings of conversations with my client; is that correct?

6    A.    That's correct.

7    Q.    Do you recall approximately how many recordings there

8    were of conversations with my client.

9    A.    I'm unaware of that.

10   Q.    Have you reviewed any of those recordings yourself?

11   A.    Just the one that I spoke of.

12   Q.    Okay.  Now, did you listen to the recording, or did

13   you review a report summarizing --

14   A.    I listened to the recording.

15         MR. HEALEY:  Your Honor, if I could have a moment.

16         THE COURT:  Sure.

17         (Brief pause.)

18         MR. WILSON:  Your Honor, may we have a very brief

19   recess?

20         THE COURT:  Sure.

21         MR. WILSON:  Thank you.

22         THE COURT:  Do you marshals want to stay here?

23         THE MARSHAL:  How brief?

24         MR. WILSON:  Five minutes.

25         THE MARSHAL:  We'll stay.

1          THE COURT:  Okay.  Then we'll take a five-minute

2     recess.

3               (Recess taken from 2:41 to 2:47 p.m.)

4          THE COURT:  Mr. Healey, anything further?

5          MR. HEALEY:  I have no more cross, Your Honor.

6          MR. WILSON:  One follow-up question.

7                    REDIRECT EXAMINATION

8     BY MR. WILSON:

9       Q.   Special Agent Bieshelt, in your direct examination

10    and cross about the location of the shooting range -- which

11    we saw pictures and video of?

12      A.   Yes.

13      Q.   During the break did you have an opportunity to

14    consult with an agent who's been to the shooting range?

15      A.   Yes.

16      Q.   And where is that shooting range located?

17      A.   I've been advised it's in Westmoreland County.

18      Q.   Here in the Western District of Pennsylvania?

19      A.   Correct.

20          MR. WILSON:  That's all the examination I have for

21    this witness, Your Honor.

22          THE COURT:  Anything further of this witness?

23          MR. HEALEY:  Just one or two questions.

24                    RECROSS-EXAMINATION

25

1    BY MR. HEALEY:

2      Q.    You have not been to the shooting range; is that

3    correct?

4      A.    Correct.

5      Q.    And your testimony is based on what someone else told

6    you?

7      A.    Correct.

8            THE COURT:  Okay.  Do you want to step down,

9    please?  Any further testimony for the Government?

10           MR. WILSON:  None.  Thank you, Your Honor.

11           MR. HEALEY:  There's no testimony from the

12   defense.

13           THE COURT:  Have counsel received copies of the

14   pretrial services report?

15           MR. HEALEY:  Yes, we have, Your Honor.

16           THE COURT:  Any corrections, additions or

17   deletions that should be made to that report?

18           MR. HEALEY:  No.  From the defense there's no

19   additions or corrections, Your Honor.

20           THE COURT:  Mr. Wilson?

21           MR. WILSON:  None, Your Honor.  I would just note

22   that for the Court, the conviction which is cited in the

23   affidavit of probable cause supporting the issuance of the

24   Complaint is on page 5 of the pretrial services report.  And

25   in the upper right-hand corner, if the Court notes the date

1    of 2/27/01 when that was a resentencing, two and a half to

2    five, that's the underlying conviction that is cited in the

3    government's affidavit of probable cause.

4              THE COURT:  Okay.  Any argument for the

5    Government?

6              MR. WILSON:  Very briefly, Your Honor, I don't

7    want to try the Court's patience with a recitation of all of

8    the 3142(g) factors, and I also want the Court to understand

9    that the Government understands that this is a gun case and

10   that the Court's determination on detention or release has

11   to be in terms of the factors set forth in 3142(g).

12             The information about Jihadist literature and so

13   forth is given to the Court to provide context for the

14   pattern of activity and the pattern of expression relative

15   to the Defendant in terms of dangerousness to the community

16   and risk of flight.

17             I want to identify for the Court just a couple of

18   the matters that are in the Defendant's criminal history

19   just by way of particular attention as they relate to flight

20   risk or terms and conditions which the Court could formulate

21   upon which some sort of pretrial release could be based.

22             The first is an offense from the 16th of November

23   of 1999, Commonwealth of Pennsylvania versus James Marvin

24   Thomas, Jr.  The charges there, Your Honor, were a violation

25   of the Uniform Firearms Act and a retail theft.

1          The indication from the department store loss
2    prevention officer in connection with the retail theft,
3    Richard Olszowski, was that the Defendant had stolen some
4    insignificant item from the store, candy or candy bars,
5    things of that kind, but once he was stopped for the theft,
6    the retail theft, the security officer found a .32 caliber
7    revolver in his right front pants pocket and 31 bullets in
8    his coat pocket.

9          The gun was checked for ownership.  There was no
10   affirmative information about ownership, but in connection
11   with that case on June 10 of 1999, the Defendant failed to
12   appear for trial, and Judge Durkin had to order that his
13   recognizance bond be forfeited and an arrest warrant issued.

14         Also, Your Honor, in Allegheny County on the 6th
15   of December, 2006, in a criminal trespass, retail theft and
16   resisting arrest case, the Defendant had stolen, again,
17   merchandise of not great significance, some DVD's and some
18   electronic media; and this the one, Your Honor, from North
19   Versailles about which Special Agent Bieshelt testified very
20   briefly a few minutes ago.

21         Upon searching the Defendant after he was
22   eventually subdued, the only weapon or only item of
23   significance that was found at that time was a pocket knife,
24   but he was again released; and on March 16 of 2007, the
25   Court of Common Pleas Judge Donna Jo McDaniel had to issue a

1   bench warrant for the Defendant for failure to appear at a

2   hearing in connection with that case.

3          I would note, Your Honor, the extensive criminal

4   record that the Defendant has, not only for weapons

5   violations, drug distribution and assault, but also, Your

6   Honor, that there currently are according to the report from

7   pretrial services 16 outstanding bench warrants for the

8   Defendant.

9          The government does not assert that those are for

10  major crimes.  I believe most of them are traffic offenses

11  and so forth, but they are evidence of a consistent,

12  persistent, longstanding attitude on the part of the

13  Defendant that he just doesn't respond to the authority of

14  the courts and/or the police.

15         And with that, Your Honor, that's all I have at

16  the present time.

17         THE COURT:  Thank you.  Mr. Healey?

18         MR. HEALEY:  Your Honor, if it may please the

19  Court, and briefly, in order for the Defendant to be

20  detained pending trial pursuant to Section 3142, the

21  government must establish by clear and convincing evidence

22  that there's a danger of flight or there's a danger to the

23  community in this situation and that there's no combination

24  of factors or conditions that will assure his appearance or

25  will assure the safety of the community.

1              My client's a life-long resident of Western

2       Pennsylvania.  He's age 34.  He has strong family ties here.

3       He has a wife.  He has a nine-month old baby.  He's been

4       employed at the East End Food Co-Op, Whole Foods and a pawn

5       shop.

6              He does have a criminal history, and we

7       acknowledge that, but we would suggest to the Court that

8       under the circumstances of the case and for a

9       straightforward gun charge, home detention with such other

10      conditions that the Court and pretrial services would deem

11      appropriate would be appropriate in this case.

12             THE COURT:  Thank you.  Anything further?

13             MR. WILSON:  Just one factor, Your Honor.  Counsel

14      quite appropriately mentions home detention.  It's our

15      understanding that the Pittsburgh Housing Authority, which

16      has jurisdiction over the residence in which the Defendant

17      most recently lived, will within the next 30 to 45 days I

18      believe move to evict him from that residence.  So it may

19      very well be the case that he doesn't have a home, and he's

20      a person of extremely limited means, Your Honor.

21             THE COURT:  Well, from what has been presented

22      here, I find there's probable cause to believe the Defendant

23      committed the offense based on the affidavit attached to the

24      Complaint and the evidence presented here.  There's also a

25      strong likelihood of conviction.

1          The crime charged is one of violence.  The

2   Defendant has an extensive criminal history, including

3   repeated crimes committed while on parole or bail.  He also

4   has a history of failures to appear in court.

5          The Defendant has family in this area, but his

6   wife is a Somali and is a U.K. citizen.  The Defendant has

7   very marginal employment.  He fled to avoid apprehension on

8   these charges as well as during some prior arrests.

9          I find that the statutory presumption of danger to

10  community and risk of flight has not be rebutted, and he'll

11  be held without bail.  Is there anything further?

12          MR. WILSON:  Nothing from the Government.

13          THE COURT:  We'll recess.

14          (Proceedings were concluded at 2:56 p.m.)

15                        - - -

16

17

18               C E R T I F I C A T E

19

20          I, Deborah Rowe, certify that the foregoing
    is a correct transcript from the record of proceedings in
21  the above-titled matter.

22

23  S/Deborah S. Rowe  _____
    Certified Realtime Reporter
24

25